**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**LOUIS BENITEZ**                                          **CIVIL ACTION**

**VERSUS**                                                 **NO. 09-6821**

**MICHAEL J. ASTRUE, COMMISSIONER**        **SECTION "R" (3)**
**SOCIAL SECURITY ADMINISTRATION**

**REPORT AND RECOMMENDATION**

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for review of the final decision of

the Commissioner denying his application for a period of disability and disability insurance benefits

("DIB") under Title II of the Social Security Act ("SSA") and for supplemental security income

("SSI") benefits under Title XVI of the SSA. The matter has been fully briefed on cross-motions for

summary judgment and is ripe for review.  For the following reasons, IT IS RECOMMENDED that

the plaintiff's motion for summary judgment be DENIED, the Commissioner's cross-motion be

GRANTED, and plaintiff's case be dismissed with prejudice.

**I.      BACKGROUND**

Plaintiff, born on December 10, 1958, is a 52-year old male.  (Adm. Rec. at 92).  Plaintiff

was born a blue baby (*id.* at 240) and underwent open-heart surgery when he was nine years old.

(*Id.* at 97).[1]  He has no formal education.  (*Id.* at 309).  In the past, plaintiff has worked as a

---

[1]      A blue baby is a baby born with a congenital cyanotic heart defect. The patient appears
blue (cyanotic), due to deoxygenated blood bypassing the lungs and entering the systemic
circulation. This can be caused by right-to-left or bidirectional shunting, or malposition
of the great arteries.

dishwasher and a bleach bottle assembly line worker.  (*Id.* at 157-58).  Plaintiff's impairments include the following: mild mental retardation (*id.* at 87); multilevel degenerative disc and facet disease of the cervical spine with a mild central and left paracentral disc protrusion, disc bulging and foraminal narrowing (*id.* at 588, 590, 595, 597); tendinopathy of his rotator cuff tendon and mild hypertrophic changes in the acromioclavicular joint (*id.* at 591); chronic back, neck and shoulder pain (*Id.* at 339, 389, 455-56, 581, 584-85, 588, 595, 597); chronic headaches (*id.* at 356); chronic obstructive pulmonary disease (*id.* at 547); mild coronary artery disease (*id.* at 292); pathologic hyper somnolence (*id.* at 268); and narcolepsy (*id.* at 547).

In an opinion dated July 17, 1989, Administrative Law Judge ("ALJ") William L. Shraberg noted that after a December 6, 1988 test performed by Brian Murphy, Ph. D., plaintiff had a verbal IQ of 68, a performance IQ of 60 and a full scale IQ score of 62.  (*Id.* at 87).  ALJ Shraberg held that plaintiff "ha[d] been functioning in the mild mentally retarded range since birth."  (*Id.*).  Shraberg also found that plaintiff suffered from cardiovascular disease and associated shortness of breath and intermittent claudication with associated chest pains.  (*Id.*).  Shraberg found that plaintiff met Listing 12.05C of Appendix 1 of Subpart P of Regulation No. 4 since the alleged onset date of December 1987.  (*Id.*).  Plaintiff's DIB and SSI payments were later terminated in 1998 due to medical improvement of plaintiff's heart disease.  (*Id.* at 97-98).

On July 18, 2003, Dr. Sangay Raina treated plaintiff for chest paint at Slidell Memorial Hospital and Medical Center ("Slidell Memorial").  (*Id.* at 240-41).  Dr. Raina reported that plaintiff had mild atypical right-sided discomfort reproducible on pressure.  (*Id.* at 240).  An electrocardiogram revealed a right bundle branch block and atrial bradycardia.  (*Id.* at 241).

Telemetry rhythm demonstrated bradycardia. (*Id.*). A stress echocardiagram was borderline. (*Id.*). Dr. Raina diagnosed plaintiff with atypical chest pain, bradycardia and hypokalemia. (*Id.*). No abnormalities were seen on a chest x-ray. (*Id.* at 242). A single-photon emission computerized tomography revealed no evidence of reversible ischemia and an estimated ejection fraction of 46 per cent. (*Id.* at 244). A Treadmill Exercise Test revealed abnormal baseline electrocardiogram with ST-T wave abnormalities, symptoms of chest discomfort in the recovery phase but no malignant arrhythmia. (*Id.* at 245). Dr. Raina terminated the test because of tiredness at approximately 85 per cent of predicted target heart rate. (*Id.*).

On August 4, 2003, Dr. Raina treated plaintiff for chest pain that radiated to his right sternal region. (*Id.* at 234). He was sweating, but Dr. Raina noted no palpitations, and plaintiff was not nauseous or vomiting. (*Id.*). Plaintiff had recently quit smoking. (*Id.*). He had tenderness in the right chest wall that was reproducible. (*Id.*). Chest and abdominal x-rays revealed no abnormalities. (*Id.* at 236-37). Dr. Raina did not think the pain was cardiac, and he prescribed Vicoprofen (three times a day). (*Id.* at 235).

On October 1, 2003, Dr. Louis Balart completed a Physical Residual Functional Capacity ("RFC") Assessment. (*Id.* at 251-57). Dr. Balart found that plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, stand and/or walk six hours in an eight-hour workday and sit about six hours in an eight-hour workday. (*Id.* at 252). Dr. Balart found that plaintiff's push and/or pull was unlimited, other than as shown for lift and/or carry. (*Id.*). Plaintiff could occasionally climb ramps/stairs/ladders/ropes/scaffolds but had no other postural limitations. (*Id.* at 253). Plaintiff had no manipulative, visual or communicative limitations. (*Id.* at 254-55).

3

Dr. Balart found that plaintiff should avoid even moderate exposure to hazards (machinery, heights, etc.).  (*Id.* at 255).  Dr. Balart recommend an RFC of light work.  (*Id.* at 257).  An addendum to Dr. Balart's report indicated that plaintiff's chest pain was atypical of cardiac origin and opined that plaintiff should be able to return to his past work as a dishwasher as he described it.  (*Id.* at 258).

On November 19, 2004, a disability field officer noted in a Disability Report that plaintiff had had to bring every form to the Department of Developmental Services for help to complete them.  (*Id.* at 175).  The disability field officer noted that she had had to repeat several basic questions to plaintiff, that he was a poor historian and that she believed plaintiff's "inabilities stem[med] from more that just a lack of education."  (*Id.*).

On January 3, 2005, an EKG revealed sinus bradycardia and incomplete right bundle branch block.  (*Id.*).  Two days later, on January 5, 2005, plaintiff underwent Cardiac Catheterization by Dr. Victor Echenique.  (*Id.* at 282).  The catheterization revealed 20 to 30 per cent stenosis and diffuse intimal disease of his left anterior descending artery with no high grade stenosis.  (*Id.*).  The testing also revealed a 30 to 40 per cent stenosis of a branch of plaintiff's posterior descending artery and a left ventricular ejection fraction of greater than 50 per cent.  (*Id.*).  The impression was mild coronary artery disease ("CAD").  (*Id.*).  Plaintiff was discharged from the hospital that same day, and Dr. Echenique restricted plaintiff to three days of rest, limited lifting to ten pounds and no climbing stairs or driving.  (*Id.* at 262-63).

On January 25, 2005, Dr. Echenique again treated plaintiff, whose leg was mildly tender to palpation.  (*Id.* at 292).  After examination, the impression was mild CAD, upper respiratory infection ("URI") and mild hypercholesterolemia.  (*Id.* at 292).

4

On February 1, 2005, plaintiff presented at Slidell Memorial Hospital with chest pain. (*Id.* at 280). The impression was no acute radiographic abnormalities, but an EKG revealed an incomplete right bundle branch block and a non-specific T-wave abnormality. (*Id.* at 280-81). There were several other abnormal lab results. (*Id.* at 275). Plaintiff was diagnosed with chest wall pain. (*Id.*).

On April 10, 2005, a Nocturnal Polysomnogram revealed that plaintiff suffered respiratory event related arousals with 48 snore arousals and an 8.7 snore arousal index and no significant sleep apnea. (*Id.* at 267). A Multiple Sleep Latency Test Report dated April 11, 2005 revealed pathologic hypersomnolence. (*Id.* at 268). In a letter dated April 13, 2005, Dennis M. Dale, M.D., a pulmonary specialist, summarized the study of plaintiff and noted that they did not reveal significant sleep apnea. (*Id.* at 551). Dr. Dale noted, however, that plaintiff had early rapid eye movements and opined that plaintiff has narcolepsy. (*Id.*).

On April 19, 2005, Dr. Echenique again treated plaintiff, who complained of leg pains that occurred when he walked. (*Id.* at 291). The impression was mild CAD, hypercholesterolemia and URI. (*Id.*).

On April 27, 2005, plaintiff underwent a Lower Extremity Arterial Study to investigate his right leg pain with ambulation. (*Id.* at 266). The study revealed triphasic distal waveforms on the left and monophasic on the right. (*Id.*). Dr. Cary Gray noted that because of the results, he would consider a CT angiogram with aortogram and runoff for further confirmation. (*Id.*).

On July 8, 2005, Thomas H. Hall, M.D. treated plaintiff, who still suffered from chest pain. (*Id.* at 546-47). Plaintiff was taking nitroglycerin as needed and one aspirin per day. (*Id.* at 546).

Dr. Hall noted that plaintiff had ischemic CAD as shown on the January 5, 2005 cardiac catheterization and that Dr. Dale had diagnosed plaintiff with asthmatic chronic obstructive pulmonary disease and narcolepsy.  (*Id.*).  Dr. Hall diagnosed plaintiff with an unstable angina pectoris, ischemic heart disease, hypercholesterolemia, elevated amylase and lipase with normal abdominal ultrasound, asthmatic chronic obstructive pulmonary disease, narcolepsy and a history of surgery for atrial or ventricular septal defect.  (*Id.* at 547).

On July 27, 2005, Cicily P. Strain, Ph. D. performed a consultative psychological evaluation, including the administration of the Wechsler Adult Intelligent Scale-Third Edition ("WAIS-III").  (*Id.* at 309-12).  Dr. Strain noted that plaintiff reported that he had never attended school, could not read a newspaper and had difficulty writing and accordingly prints his name.  (*Id.* at 309).  Plaintiff reported that he had a driver's license that he had obtained by oral examination, which allowed for open answers as opposed to multiple choice questions.  (*Id.*).  Dr. Strain noted that plaintiff's adaptive behavior or daily living skills appeared somewhat below age level expectations.  (*Id.* at 310).  The results of the WAIS-III revealed that plaintiff had difficulty in several verbal areas, such as in vocabulary, arithmetic and similarities.  (*Id.* at 310).  Plaintiff was unable to process abstract generalizations, and his receptive language skills were poor.  (*Id.* at 311).  Plaintiff's WAIS-III test scores were Verbal 67, Performance 68 and Full Scale 65.  (*Id.* at 310).  Dr. Strain noted that there were some inconsistencies in the testing, and malingering could not be ruled out.  (*Id.* at 311).  Dr. Strain ultimately suspected Borderline or Low Average range of abilities, and he recommended, "If Disability Determinations has past records of cognitive tests, current test results should be cross-validated against previous test results."  (*Id.* at 312).

6

On August 8, 2005, Dr. Felix Rabito, Sr. performed a consultative physical examination. (*Id.* at 313-22). Plaintiff reported that he could not work as a dishwasher because of the lifting and carrying required, that he had no formal schooling and that he could not read or write. (*Id.* at 313). Plaintiff complained of leg cramps and lack of strength in his upper extremities. (*Id.*). Dr. Rabito noted a weak pulse in plaintiff's extremities. (*Id.* at 315). Dr. Rabito performed an electrocardiogram, which revealed a normal sinus rhythm with PR interval at the upper limits and small R prime in V1, V2 and non-specific T-wave changes. (*Id.*). Dr. Rabito opined that plaintiff's functional limitation was moderate and more likely related to his weight and past cigarette smoking. (*Id.* at 316). Dr. Rabito also opined that plaintiff appeared to be limited by his lack of formal education and his inability to read and write. (*Id.*). In the Medical Source Statement of Ability to Do Work-Related Activities (Physical), Dr. Rabito concluded that plaintiff was limited in his lifting/carrying, had frequent postural limitations and limited environmental limitations in that plaintiff should be limited in his exposure to temperature excrements and fumes, odors, chemicals and gases. (*Id.* at 317-20).

On April 25, 2006, the NorthShore Regional Medical center ("NorthShore") emergency room treated plaintiff, who complained of cough, headaches and chest pain for three days. (*Id.* at 380). An x-ray of plaintiff's chest reveled that his lungs were mildly hyper inflated, which suggested chronic obstructive pulmonary disease. (*Id.* at 377). An electrocardiogram revealed borderline inferior Q-waves and noted, "consider left atrial abnormality." (*Id.* at 378).

NorthShore again treated plaintiff on May 14, 2006, when plaintiff again complained of chest pain and right-side head pain for two days. (*Id.* at 366). An EKG revealed borderline AV

conduction delay.  (*Id.* at 364).  Plaintiff was diagnosed with chest pain and migraine headaches. (*Id.* at 373).

Plaintiff again presented at Northshore on August 7, 2006, complaining of headaches on and off for the prior two months with dizziness.  (*Id.* at 349).  He rated the pain at 5/5.  (*Id.*).  Plaintiff reported the headaches as almost daily.  (*Id.* at 355).  Plaintiff was diagnosed with chronic headaches.  (*Id.* at 356).  Plaintiff was referred to a neurologist and prescribed Esgic-Plus.  (*Id.*).

On September 4, 2006, NorthShore treated plaintiff for dysuria, pain in his right side and back pain for two days.  (*Id.* at 339).  A CT scan of his abdomen revealed mild splenomegaly, prominence of the left lobe of the liver and enlargement of the prostate.  (*Id.* at 337).

Dr. Miljana Mandich performed a consultative physical examination on February 27, 2007. (*Id.* at 389-94).  Plaintiff complained of chest pain, shortness of breath and dizzy spells.  (*Id.* at 389). He reported "shooting and heavy" chest pain at rest that lasted anywhere from five to 40 minutes. (*Id.*).  Plaintiff had a nebulizer at home and an albuterol inhaler to use as needed for shortness of breath.  (*Id.*).  He reported shortness of breath after walking approximately two blocks.  (*Id.*).  He stated that he slept with three pillows.  (*Id.*).  Plaintiff noted that he had undergone a sleep study in 2005, was supposed to return to titrate the continuous positive airway pressure but had not done so because of Hurricane Katrina.  (*Id.*).  Plaintiff reported sleeping well as long as he used his inhaler or nebulizer before he went to sleep.  (*Id.*).  He stated that he was sometimes tired but did not have excessive daytime sleepiness.  (*Id.*).  Plaintiff also informed Dr. Mandich that he suffered from periodic lower back pain and stiffness after a fall on a boat deck when he was 19 years old.  (*Id.*). He reported dizziness when he stood up too fast after sitting for a while.  (*Id.*).

8

On examination, plaintiff was five feet two inches tall and weighed 169 pounds. (*Id.* at 391). Plaintiff's straight leg test was negative, he had a normal range of motion in his neck and lower back, and he reported stiffness in his lower back in the morning. (*Id.*). He could walk on his heels and toes and squat and rise without support. (*Id.*). An EKG was within normal limits. (*Id.* at 393). A lumbar spine x-ray revealed minimal degenerative changes. (*Id.* at 395). Dr. Mandich noted that plaintiff had very distant breath sounds and very distant cardiac sounds, suggestive of significant emphysema. (*Id.*).

NorthShore treated plaintiff on March 9, 2007 for back pain radiating to his left shoulder and left arm. (*Id.* at 455). During the examination, plaintiff was anxious and cooperative. (*Id.* at 456). The neurological examination revealed left arm weakness, and the musculoskeletal examination was abnormal, with pain/discomfort in his back and left shoulder. (*Id.*). Plaintiff was prescribed Lortab and Robaxin. (*Id.* at 463).

On March 13, 2007, a Physical RFC Assessment was completed. (*Id.* at 399-406). The form indicates that plaintiff has no limitations whatsoever. (*Id.*). Plaintiff argues, however, that a medical consultant, or DDS physician, completed the form and not a physician or a medical professional. (*Id.* at 406).

On March 19, 2007, Dr. Frederick Keppel treated plaintiff, who had back pain, shoulder pain, neck pain and left leg pain. (*Id.* at 597). Dr. Keppel diagnosed lower back pain and prescribed Motrin and Flexeril. (*Id.*). Dr. Keppel prescribed refills for both medications on April 16, 2007. (*Id.* at 593).

On April 23, 2007, an MRI of plaintiff's cervical spine revealed multilevel degenerative disc

and facet disease, with the following specific findings: (1) C3-C4 mild bilateral C4 foramina narrowing secondary to uncinate process and facet hypertrophy; (2) C4-C5 minor central disc bulging, mild degenerative facet hypertrophy, minor narrowing of the central canal and mild C5 foramina narrowing without nerve impingement; (3) C5-C6 shallow central on left paracentral disc protrusion, mild mass effect upon the ventral aspect of the cervical cord and mild left C6 foramina stenosis without definite C6 root impingement; and (4) C6-C7 mild broad based disc bulging with mild narrowing of the central canal and foramina with no evidence of nerve root impingement. (*Idi* at 590). The impression was "multilevel degenerative disc and facet disease, as discussed; of particular note, there is a mild central and left paracentral disc protrusion at C5-C6 with mild mass effect upon the cervical cord, at and to the left of the midline." (*Id.*). Also on April 23, 2007, an MRI of plaintiff's left shoulder revealed thickening and increased signal intensity of his rotator cuff tendon compatible with tendinopathy, small degenerative cyst in the humeral head and mild hypertrophic changes in the acromioclavicular joint. (*Id.* at 594).

Four days later, Dr. Keppel again treated plaintiff for left shoulder pain that was keeping plaintiff up all night. (*Id.* at 588). Dr. Keppel reviewed the MRI reports and diagnosed plaintiff with C5-C6 disc protrusion and left shoulder tendinopathy. (*Id.*). Dr. Keppel again prescribed Motrin and Flexeril. (*Id.* at 589).

Dr. Keppel treated plaintiff on May 25, 2007 for cervical neck pain. (*Id.* at 595). Plaintiff could not sleep at night due to the pain. (*Id.*). Dr. Keppel prescribed Medrol dose pack. (*Id.*). On May 31, 2007, an employee of Dr. Keppel's noted that plaintiff had called and requested neck surgery and would discuss it with Dr. Keppel during his next appointment. (*Id.* at 587). Dr. Keppel

treated plaintiff again on June 18, 2007 for neck pain.  (*Id.* at 584).  Dr. Keppel referred plaintiff to the orthopedic clinic for neck pain and cervical disc disease and prescribed Ultracet and Flexeril. (*Id.* at 585-86).

On July 5, 2007, Dr. Victor Echenique treated plaintiff, who needed to obtain clearance for neck surgery that was to be performed at West Jefferson.  (*Id.* at 417).  An EKG revealed an incomplete right bundle branch block.  (*Id.* at 418).  On July 9, 2007, an exercise stress/rest myocardial perfusion scintigraphy revealed no evidence of reversible ischemia and an estimated ejection fraction of 57 per cent.  (*Id.* at 416).   An echocardiagram revealed borderline left ventricular hypertrophy, mild mitral regurgitation, aortic insufficiency, tricuspid regurgitation and diastolic dysfunction.  (*Id.* at 411).

On August 19, 2003, plaintiff filed applications for a period of disability and DIB under title II of the SSA and for SSI under Title XVI of the SSA.  (*Id.* at 92-94).  Plaintiff alleged a disability onset date of July 17, 2003.  (*Id.* at 92).  The Regional Commissioner initially denied plaintiff's benefits in a notice dated October 3, 2003.  (*Id.* at 47-50).  Plaintiff timely filed a request for a hearing.  (*Id.* at 51).  ALJ Juan Marrero conducted a hearing on June 29, 2005 at which vocational expert Kelly Roberts testified.  (*Id.* at 626-37).  ALJ Marrero rendered an unfavorable decision on February 28, 2006.  (*Id.* at 33-43).  Plaintiff timely filed a request for review on April 18, 2006.  (*Id.* at 70).  The Appeals Council denied the request for review on July 6, 2007.  (*Id.* at 78-80).

On November 9, 2007, the Appeals Council vacated the denial of review and remanded the case to the ALJ for further evaluation of the results of consultative examinations performed subsequent to the hearing, evidence that the ALJ had failed to proffer to plaintiff as required by

HALLEX I-2-7-30A-C and HALLEX 1-2-7-35.  (*Id.* at 82-83).  The remand order instructed the ALJ to properly proffer and enter post-hearing medical evidence into the record, to give further consideration to plaintiff's maximum RFC, to provide appropriate rationale with specific references to evidence of record in support of the assessed limitations and, if necessary, to obtain evidence from a vocational expert on the effect of the assess limitations on plaintiff's occupation base.  (*Id.* at 83).

ALJ Michael Hertzig conducted a hearing on remand on October 16, 2008.  (*Id.* at 604-25).  Vocational expert Patricia Knight appeared but did not testify.  (*Id.* at 604).  On February 13, 2009, the ALJ rendered an unfavorable decision.  (*Id.* at 10-22).  The ALJ found that plaintiff had the severe impairments of hyper somnolence, borderline intelligence and degenerative disc disease of the cervical spine.  (*Id.* at 15).  He found that plaintiff did not meet or medically equal a Listing, based on his finding that plaintiff's IQ scores were invalid.  (*Id.* at 16).  The ALJ found that earlier IQ test results cited in a prior fully-favorable decision did not make the current IQ scores valid because the report was not in the file, and the ALJ determined that the report was outweighed by the most recent assessment, and plaintiff's reported capabilities demonstrated that he actually functions at a higher level than mildly deficient.  (*Id.*).

The ALJ concluded that plaintiff had the RFC to perform medium work, except that it must be unskilled in nature and limited to simple, repetitive tasks.  (*Id.* at 18).  The ALJ found that plaintiff "is capable of performing past relevant work as a bottle washer and dishwasher" because "this work does not require the performance of work-related activities precluded by" his RFC.  (*Id.* at 21).  The ALJ thus concluded that plaintiff is not disabled under the SSA.  (*Id.*).

## II.    STANDARD OF REVIEW

The function of a district court on judicial review is limited to determining whether there is "substantial evidence" in the record, as a whole, to support the final decision of the Commissioner as trier of fact, and whether the Commissioner applied the appropriate legal standards to evaluate the evidence. *See* 42 U.S.C. § 405(g); *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir.1999); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir.1995); *Carriere v. Sullivan*, 944 F.2d 243, 245 (5th Cir.1991). If the Commissioner's findings are supported by substantial evidence, this Court must affirm them. *Martinez*, 64 F.3d at 173.

"Substantial evidence" is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401(1971); *Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002).   It is more than a scintilla, but may be less than a preponderance. *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir.1993).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  *See Boyd v. Apfel*, 239 F.3d  698, 704 (5th Cir. 2002).

A district court may not try the issues *de novo*, re-weigh the evidence, or substitute its own judgment for that of the Commissioner.  *Carey v. Apfel,* 230 F.3d 131, 135 (5th Cir. 2000); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir.1995); *Spellman*, 1 F.3d at 360. The Commissioner is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. *See Arkansas v. Oklahoma*, 503 U.S. (1992).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  *Carey,* 230 F.3d at 135.  Any of the Commissioner's findings of fact that are supported by substantial evidence are conclusive.  *Ripley*, 67 F.3d at 555.  Despite this Court's limited function on review, the Court must scrutinize the record

13

in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.   *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir.1992);   *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir.1990).

## III.    ENTITLEMENT TO BENEFITS UNDER THE ACT

To be considered disabled and eligible for disability benefits under the Act, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   A claimant, such as the plaintiff, is considered disabled only if his physical or mental impairment is so severe that he is unable to do not only his previous work, but cannot, considering his age, education and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which he lives, whether a specific job vacancy exists, or whether he would be hired if he applied for work.  42 U.S.C. § 1382(a)(3)(B).   The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 - 404.1599 & Appendices, §§ 416.901 t - 416.988 (1995).   The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.   *Id*. §§ 404.1520, 416.920; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.1994).

In *Shave v. Apfel*, 238 F.3d 592 (5th Cir.2001), the Fifth Circuit restated the five-step procedure to make a disability determination under the Social Security Act:

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. First, the claimant must not be presently working at any substantial gainful activity. Second, the claimant must have an impairment or combination of impairments that are severe. An impairment or combination of impairments is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." Third, the claimant's impairment must meet or equal an impairment listed in the appendix to the regulations. Fourth, the impairment must prevent the claimant from returning to his past relevant work. Fifth, the impairment must prevent the claimant from doing any relevant work, considering the claimant's residual functional capacity, age, education and past work experience. At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant acquits this responsibility, at step five the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. If the Commissioner meets this burden, the claimant must then prove he in fact cannot perform the alternate work.

*Shave*, 239 F.3d at 594 (quoting *Crowley v. Apfel*, 197 F.3d 194 (5th Cir.1999)).  If the ALJ determines that a plaintiff is not disabled under Step V of the five-part test, the ALJ must establish that the claimant has a "residual functional capacity," given the claimant's age, education, and past work experience, to perform other work available in the national economy.  *Leggett v. Chater*, 67 F.3d 558, 564 n.11 (5th Cir. 1995).  Step V also requires the Commissioner to use the medical-vocational guidelines to make his disability determination.  *Id.*

The four elements of proof weighed to determine whether evidence of disability is substantial are: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history.  *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir.1995). "The Commissioner, rather than the

courts, must resolve conflicts in the evidence." *Id.*

## IV.  ISSUES ON APPEAL

There are two issues on appeal:

(1)  Whether substantial evidence supports the ALJ's finding that plaintiff does not meet or equal Listing 12.05C.

(2)  Whether the ALJ erred when he failed to consult a vocational expert as to plaintiff's ability to perform past relevant work and whether substantial evidence supports the ALJ's conclusion as to plaintiff's past relevant work.

## V.  ANALYSIS

### 1.  Whether substantial evidence supports the ALJ's finding that plaintiff does not meet or equal Listing 12.05C.

Listing 12.05 contains "an introductory paragraph with the diagnostic description for mental retardation" and "four sets of criteria (paragraphs A through D)." C.F.R. Listing 12.00(A).

12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
OR
B. A valid verbal, performance, or full scale IQ of 59 or less;
OR
C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
OR
D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
1. Marked restriction of activities of daily living; or

16

      2. Marked difficulties in maintaining social functioning; or
      3. Marked difficulties in maintaining concentration, persistence, or pace; or
      4. Repeated episodes of decompensation, each of extended duration.

C.F.R. Listing 12.05. To satisfy Listing 12.05(C), a claimant must demonstrate (1) a qualifying IQ score, (2) deficits in adaptive functioning manifested before age 22, ***and*** (3) a physical or other mental impairment that imposes an additional and significant work-related limitation of function. *Randall v. Astrue*, 570 F.3d 651 (5th Cir. 2009); *R.O.L. v. U.S. Comm'r Social Sec. Admin.*, Civ. A. No. 09-cv-0253, 2010 WL 996422, at *2 (W.D. La. Mar.17, 2010).

      Plaintiff argues that he satisfies Listing 12.05(C). Plaintiff disputes the ALJ's finding that plaintiff's IQ scores are invalid. Specifically, the ALJ held that "[i]n terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." (Adm. Rec. at 16). While the ALJ noted that the results of the administration of the WAIS-III revealed a verbal IQ score of 67, a performance IQ score of 68 and a full scale IQ score of 65, he questioned the results given the possibility of malingering "present due to apparent minimal responses to questioning and subpart performance." (*Id.* at 15-16). He found that the "[m]ental status evaluation was also noted to support an inconsistent response pattern." (*Id.* at 16). Recognizing that the "examiner assessed the claimant as actually functioning at a higher level of borderline to low average," he concluded that the earlier IQ scores were invalid. (*Id.*).

      The Fifth Circuit has held that "[a]n ALJ may make factual determinations on the validity of I.Q. tests." *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) (citing *Pierre v. Sullivan*, 884

F.2d 799, 803 (5th Cir. 1989)).  "In considering the validity of a test result, [the ALJ] should note and resolve any discrepancies between formal test results and the individual's customary behavior and daily activities."  20 C.F.R. Pt. 404, Appx. 1 § 5C.  Citing the record, plaintiff argues that substantial evidence supports his argument that the IQ scores are valid: (1) Plaintiff has no history of formal education; (2) Plaintiff underwent unsuccessful attempts to educate himself both as a child and as an adult; (3) His work experience is unskilled and required no reading, writing, calculating or reasoning; (4) He underwent an oral – as opposed to written – driving test; (5) He allegedly couldn't hold down a job due to his inability to follow spoken instructions; and (6) He could not fill out the DDS forms.

       Notwithstanding such evidence, the Court finds that substantial evidence supports the ALJ's conclusion that plaintiff's IQ scores are invalid and not in line with plaintiff's customary behavior and daily activities.  The ALJ recognized that plaintiff had no formal education, was unable to recite the complete alphabet and unable to spell properly. (*Id.* at 19).  However, and apart from the findings noted above, the ALJ noted that Dr. Strain assessed plaintiff as actually functioning at a higher level of borderline to low average.  (*Id.*).  He noted that there was no evidence of a mental health disorder and no history of any such care.  (*Id.*).  Dr. Strain considered plaintiff as able to understand and remember and follow at least simple instructions as well as some multi-step instructions.  (*Id.*).  "He was fully oriented; had appropriate attention span; did not display any frustrations completing tasks; memory was intact; and he was considered able to interact appropriately with co-workers and supervisors." (*Id.*).  In addition, Dr. Strain estimated plaintiff's global assessment of functioning as good at 75 out of 100.  (*Id.*).

18

Despite this Court's limited function on review, the Court must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir.1992); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir.1990). Apart from the factual findings listed above, the Commissioner lists a litany of other facts that support the ALJ's conclusion. (*See* Doc. #22 at pp.6-10). For example, plaintiff demonstrated an awareness of current events when he stated that he was nervous about his son joining the Army "because of what's going on overseas." (Adm. Rec. at 614). Plaintiff was able to identify the current and recent past presidents, answer geography questions and recognize media figures. (*Id.* at 312). And while plaintiff had difficulty solving problems during an elapsed time, he was able to keep track of time at home to know when to pick his wife up from work. (*Id.*). He displayed an awareness for safety hazards, and his social insight and judgment were appropriate. (*Id.*).

Accordingly, evidence supported both plaintiff's and the ALJ's conclusions, but this Court can not second-guess the ALJ as long as his conclusion is supported by substantial evidence. It is the ALJ's duty to weigh the evidence. As noted above, a district court may not try the issues *de novo*, re-weigh the evidence, or substitute its own judgment for that of the Commissioner. *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir.1995); *Spellman*, 1 F.3d at 360. The Commissioner is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. *See Arkansas v. Oklahoma*, 503 U.S. (1992). The Court finds that the ALJ's conclusion that the IQ scores are invalid is supported by substantial evidence.

19

Alternatively, plaintiff argues that the ALJ erred when he allegedly failed to fully and fairly develop the record by not obtaining the earlier IQ test report and by not ordering a new IQ test.  The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits.  *Pierre*, 884 F.2d at 802;  *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir.1984).  If the ALJ does not satisfy his duty, his decision is not substantially justified.  *Kane*, 731 F.2d at 1219.  Reversal of his decision, however, is appropriate only if the applicant shows that he was prejudiced.  *Id.* at 1220.  Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision. *Id.*

The Court finds that plaintiff has produced no evidence that the obtaining of the earlier IQ scores or an additional IQ test would have led to a different decision. The 1988 IQ test was not part of the record before the ALJ here.  Had plaintiff wanted to include the 1988 test results in the administrative record before the ALJ, plaintiff had ample opportunity to do so.  The ALJ did not abuse his discretion in failing to order another consultative examination.  Before the ALJ were the results of a valid examination of plaintiff by Dr. Strain who provided legitimate reasons for her opinion that plaintiff's IQ scores were invalid.  The ALJ specifically relied on the results of Dr. Strain to conclude that the IQ results were invalid, and, as outlined above, substantial evidence supports the ALJ's conclusion to do so.

> **2.**    **Whether the ALJ erred when he failed to consult a vocational expert as to plaintiff's ability to perform past relevant work and whether substantial evidence supports the ALJ's conclusion as to plaintiff's past relevant work.**

Plaintiff argues that the ALJ erred when he failed to consult a vocational expert on remand

from the Appeals Council.  Plaintiff contends that an ALJ must consult a vocational expert when a non-exertional impairment – such as plaintiff's borderline intellectual functioning – exists.  Plaintiff also argues that the ALJ's opinion fails to mention the consultative examiner's opinion that plaintiff should avoid fumes, odors, chemicals and gases and even moderate exposure to hazards.  Lastly, plaintiff asserts that the ALJ's failure to consult a vocational examiner violates the Appeals Council's remand order.  For the following reasons, the Court rejects these arguments.

Here, substantial evidence supports the ALJ's conclusion that plaintiff can perform his past relevant work as a bottle washer and dishwasher.  As the Commissioner notes, in one report, plaintiff described his past work as requiring him to frequently lift ten pounds.  (Adm. Rec. at 165).  In a second report, plaintiff reported that his past work required him to stand seven hours per day, to lift as much as 50 pounds and to frequently lift 25 pounds.  The testimony of Kelly Roberts, the vocational expert who testified at plaintiff's earlier 2005 hearing, revealed that plaintiff's past relevant work was unskilled, medium work.  (*Id.* at 628-29).  The regulations define medium work as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(c).  Plaintiff's own reporting supports the ALJ's conclusion that he can perform his past relevant work.  When, as here, the Commissioner finds that a claimant can perform past relevant work, vocational testimony is not required.  *Nicholson v. Massanari*, 254 F.3d 1082, 1082 (5th Cir. 2001); *Williams v. Califano*, 590 F.2d 1332, 1334 (5th Cir. 1979).

Plaintiff next contends that the ALJ's failure to include in his opinion the consultative examiner's opinion that plaintiff should avoid fumes, odors, chemicals and gases and even moderate

exposure to hazards.  On the form entitled "Medical Source Statement of Ability to Do Work

Reelated Activities (Physical), Dr. Rabito opined that plaintiff should avoid fumes, odors, chemicals

and gases.  (Adm. Rec. at 320).[2]   And a state agency physician recommended that plaintiff avoid

even moderate exposure to hazards.  (*Id.* at 255).  While the ALJ accepted Dr. Rabito's opinion "for

the most part," (*id.* at 21), the ALJ did not have to accept any portion of the opinion contrary to the

substantial evidence in the record.  *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).  As the

Commissioner correctly notes, Dr. Rabito also noted that there was no abnormality in plaintiff's

respiration, in that"[t]he thorax was symmetrical; the lungs were clear to ausculation and percussion,

a wheeze was not heard."  (*Id.* at 315).  Plaintiff also underwent a pulmonary functional analysis,

which revealed that plaintiff's pulmonary study was normal.  (*Id.* at 271-71).  As noted above, a

district court may not try the issues *de novo*, re-weigh the evidence, or substitute its own judgment

for that of the Commissioner.  *Carey,* 230 F.3d at 135.  Here, the ALJ was entitled to weigh the

evidence and arrive at the conclusion that no environmental limitations were necessary in the RFC

finding.[3]

 Lastly, plaintiff argues that the ALJ's failure to consult a vocational examiner violates the

---

[2]     The Court also notes that Dr. Rabito opined that plaintiff could occasionally lift 50
pounds, frequently lift 25 pounds and that any alleged impairment did not affect
plaintiff's standing and walking.  (Adm. Rec. at 317).

[3]     For the same reasons, the Court rejects plaintiff's argument that the ALJ erred when he
failed to mention that the state agency physician recommended that plaintiff avoid even
moderate exposure to hazards.  The physician failed to "[d]escribe how these
environmental factors impair activities and identify hazards to be avoided.  Also, explain
how and why the evidence supports your conclusions in items 1 through 8.  Cite the
specific facts upon which your conclusions are based."  (Adm. Rec. at 255).  The
physician explained nothing and provided no evidence on which his conclusion was
based.

Appeals Council's remand order.  But plaintiff's argument contradicts the plain language of that order.  The Appeals Council held only that "[*i*]*f necessary*, obtain supplemental evidence from a vocational expert . . ."  (Adm. Rec. at 83) (emphasis added).  As noted above, when, as here, the Commissioner finds that a claimant can perform past relevant work, vocational testimony is not required.  *Nicholson*, 254 F.3d at 1082; *Williams*, 590 F.2d at 1334.  Accordingly, because it was not necessary for the ALJ to consult a vocational expert on remand, the Court rejects this argument.

## VI.   CONCLUSION

Plaintiff has failed to show that the ALJ's RFC assessment is not supported by substantial evidence or that the ALJ erred in any fashion.  Substantial evidence supports the ALJ's finding that plaintiff was not disabled within the meaning of the Social Security Act at any time through the date of the determination.  Accordingly,

**IT IS RECOMMENDED** that the plaintiff's Motion for Summary Judgment be DENIED, the Commissioner's Cross-Motion be GRANTED and that plaintiff's complaint be dismissed with prejudice.

## NOTICE OF RIGHT TO OBJECT

Objections must be: (1) specific, (2) in writing, and (3) served within fourteen (14) days after being served with a copy of this report.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 1(a), 6(b) and 72(b).  A party's failure to object bars that party from: (1) entitlement to *de novo* review by a district judge; and (2) appellate review of the un-objected-to factual findings and legal conclusions accepted by the district court, except upon grounds of plain error.  *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 11th day of February, 2011.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**